IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREEM GARRETT | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| GEORGE WAGNER, et al. | : | NO. 11-CV-1888 |

## MEMORANDUM AND ORDER

**Ditter, J.**                                                        **August 4, 2015**

Defendants, Warden George Wagner, Sergeant Dwight Rescorla, Lieutenant
Miguel Castro, and Officer Christopher Vollmer have filed a motion for summary
judgment on all counts raised against them in this civil rights complaint.  For the reasons
that follow, the motion is being granted.

### I.  Factual and procedural history[1]

Kareem Garrett brings this action under 42 U.S.C. § 1983 for violation of his First
and Eighth Amendment rights stemming from his incarceration at the Berks County Jail
in 2010 and 2011.  Garrett claims that while he was held in the jail's quarantine intake
unit,  he was "forced to endure deplorable, inhumane, and unsanitary conditions."  *Plt's
Mem*. at 1.  He claims further that his attempts to be moved, to get cleaning products, and
to get medical care for a rash resulting from being housed in this cell were rebuffed and
that he was disciplined for his complaints.

---

[1] For purposes of this motion, the facts are viewed in the light most favorable to the plaintiff as the non-
moving party.

A.  Conditions of confinement

From November 9 to November 11, 2010, Garrett was confined in the intake block of the Berks County Jail after being transferred from a state correctional facility.[2] According to his deposition testimony, Garrett likened the condition of his cell to a gas station restroom.  *Plt.'s Exh. D,* Garrett Dep., at 22.  He saw "human feces," "dirt caked, all types of stuff on the floor."  *Id.*  There was urine on the toilet and "[t]he smell was awful."  *Id.* at 23.

At the time Garrett was housed on the intake block, Officer Vollmer was the unit officer on duty and was responsible for supervising the cleaning of the cells.  Garrett complained to Vollmer about the condition of the cell and asked to be moved.  When his request was denied by Vollmer, Garrett asked for cleaning supplies.  Vollmer said he would try to get the supplies.  *Id.* at 23-24.

A few hours later, Garrett was given a meal tray but he couldn't eat it because of the smell of his cell.  When the meal trays were picked up, he again asked for cleaning supplies but they were still unavailable.  *Id.* at 25.  Garrett was willing to give Volmer "some grace days, two or three days" to obtain the supplies.  *Id.*  Although it is not clear how long Garrett and his cell mate, Sean Lopp, waited, at some point they used their

---

[2] The state correctional facilities sometimes house prisoners in this county facility because of overcrowding or for medical purposes.  *See. Def.'s Exh. A*, Wagner Dep., at 19.  There is nothing in the record to indicate Garrett was transferred for medical reasons.

shirts to clean the cell with hand soap.[3]

The next day, after cleaning the cell, Garrett again asked to be moved to another cell.  Vollmer refused the request and Garrett asked to see a sergeant.  *Id.* at 27.  Vollmer contacted Sergeant Rescorla by phone.  Garrett was present for the call but did not speak to the sergeant.  He testified that he heard Vollmer "explaining the conditions of the cell," and asking for cleaning supplies, but Vollmer did not ask if Garrett could be moved to another cell.  *Id.* at 29.  Continued requests to be moved to another cell were refused by Vollmer, so on day three Garrett asked to speak to a lieutenant.  *Id.* at 30.  When that request was denied, he asked for a grievance form.  Vollmer then told Garrett to go inside his cell, called him a racist name, and suggested he should be used to living in these conditions because he was from the ghetto.  *Id.* at 31-32.  Garrett received and completed a grievance form.  *Id.* at 32.

The defendants deny Garrett's claim that his cell was uninhabitable, and that he requested and was denied cleaning supplies.  According to Officer Vollmer, his duties included making sure cells were inspected and clean when new prisoners were assigned.  *See Plt.'s Exh. G,* Vollmer Dep., at 11-12.  This inspection included checking mattresses, making sure the water was working, and checking for smells.  *Id.*  He agreed that Garrett

---

[3] Garrett testified that he did not know if they cleaned the cell on the second or third day.  However, consistent with other exhibits concerning Lopp's disciplinary action, Lopp's declaration indicates that he was placed inthe cell the same day as Garrett, was in the cell for "about one day," and was moved out of the cell into the restrictive housing unit on the second day he was at the facility.  *Plt's Exh. E.*, Lopp Decl., ¶¶ 3, 8.  Thus, this clean-up had to have occurred on day one or two (although Lopp states that they were never able to clean the cell).  *Id.* at ¶ 7.

asked for cleaning supplies and testified that the supplies were provided "almost immediately." *Id.* at 27. Vollmer also testified that the condition of Garrett's cell was "decent" and "clean." *Id.* at 28.

Sergeant Rescorla, Vollmer's supervisor, testified that the officer assigned to the block was responsible for inspecting the condition of the cells – to make sure the toilet was working, water was running, light was working, and cell was cleaned. *See Def.'s Exh. D,* Rescorla Dep., at 33. If a cell did not pass inspection, it would not be used. *Id.*

The defendants also deny Garrett suffered any harm as the result of his three-day confinement in this cell. Instead, they contend Garrett's repeated complaints were an effort to be removed from the county facility and returned to the state prison system where inmates enjoy more freedom and amenities.

B. Retaliation for filing grievances and inmate correspondence

1. *November 2010*

After the above-described incident, Vollmer issued Garrett a misconduct for threatening an officer. The misconduct indicated that Garrett had repeatedly asked to be moved to another cell. When told he could not speak to a lieutenant, Vollmer wrote that Garrett threatened him by saying "there would be a problem if he didn't get to talk to a Lieutenant." *See Plt's Exh. L*, Nov. 11, 2010 Misconduct Report. Garrett responded that he had said "I guess it's a problem aski[n]g to talk to a Lt." *Id.* A hearing officer credited Vollmer's version of the incident and concluded that the statement was an not a

direct threat, but was an indirect and implied threat.  Rescorla agreed with the decision to discipline Garrett and had him sent to the restrictive housing unit (solitary confinement) that same day.  Warden George Wagner reviewed this misconduct when Garrett appealed his punishment.  Wagner agreed that the statement was an indirect threat, but reduced the sentence to eleven days in solitary confinement.[4]  Garrett believes this disciplinary action was initiated by Vollmer and approved by Wagner in retaliation for his complaints about the cell.

        2.  *March 2011*

On January 29, 2011, while in the restricted housing unit, Garrett claims he ate a foreign substance that was in his food.  *Plt.'s Exh.* D, at 136.  As a result he became ill.  Throughout the next few months he had stomach pain and vomited.  Some of the vomit contained blood.  This resulted in his filing numerous grievances and requests for medical attention.

Defendant Castro was the grievance coordinator at the facility and was responsible for answering inmate grievances.  On March 14, 2011, Castro issued Garrett a misconduct for harassment by communication.  Castro reported that Garrett had filed "a large quantity of frivolous, unfounded, and/or repetitive grievances, despite the numerous warnings to stop doing so."  *See Plt.'s Exh. X*, Mar. 14, 2011 Misconduct Report.  Garrett was again placed in the restricted housing unit, this time for ten days.  Garrett's appeal to Wagner

---

[4]  The record before me does not indicate the original length of confinement imposed by the hearing officer.

was denied.

## II.  Standard of review

The standard for summary judgment is well-established.  I must consider the evidence in the light most favorable to the non-moving party.  Summary judgment may be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

However, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions to defeat a summary judgment motion.  Here, Garrett must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). He "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1992).  He cannot "merely rely upon conclusory allegations in [his] pleadings or in memoranda and briefs." *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir. 1992).

## III. Discussion

### A.  Conditions of Confinement claim

This case involves two claims against several defendants.  First, is Garrett's Eighth Amendment claim, under 28 U.S.C. §1983, against Vollmer and Rescorla.  To prevail, Garrett must establish that: (1) his conditions of confinement are sufficiently serious

under an objective standard; and (2) prison officials acted with deliberate, subjective indifference to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Prison officials must provide inmates with humane conditions of confinement; including adequate food, clothing, shelter, and medical care, and must take reasonable steps to ensure their safety. *Id.* at 832. Applying a totality of the circumstances test, "[r]elevant conditions include the length of confinement, the amount of time prisoners must spend in their cells each day, sanitation, lighting, bedding, ventilation, noise, education and rehabilitation programs, opportunities for activities outside the cells, and the repair and functioning of basic facilities such as plumbing, ventilation, and showers." *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir. 1996). Thus, Garrett must offer evidence from which a jury could objectively conclude that the unsanitary conditions reach an unconstitutional level and subjectively conclude that the prison official was deliberately indifferent to the substantial risk of harm to the prisoner.

The evidence establishes that Garrett spent only two nights in this cell because of the misconduct filed by Vollmer. That misconduct was upheld and it was only in response to the misconduct charge that Garrett filed a communication form on November 12, 2010. There is nothing in this communication that would put anyone on notice that he was complaining that his cell was uninhabitable. There is no mention of feces, smells or problems with the toilet and sink. He only says he "need[ed] to clean my cell to keep

maintaining my personal hygiene and my living." *See Plt.'s Exh. C; Def.'s Exh. P*, at 2. A grievance filed the same day is a complaint about Vollmer, not about the condition of his cell. Garrett states "All I ask was to clean my cell to maintain my personal hygiene and now I'm being charge[d] with threats and harassment." *Def.'s Exh. P*, at 3. There is no mention of problems with the sink, toilet, feces, dirt or smells.

In a second communication form, dated November 13, 2010, and filed after he was moved to the restrictive housing unit, Garrett complained that an inspection was not conducted when he was assigned his cell (as required by prison regulations). In this communication, Garrett describes the condition of his cell: "There were racial remarks writing [sic] on the fixtures and living area, urine spots, urine smell, food in the desk, bugs flying around, spit around the sink, the place was filthy." *Id.* at 4. However, there is no mention of human feces, his inability to eat, use the bathroom facilities or practice his religion. In his grievance filed the same day, Garrett challenges his misconduct but does not complain about the condition of his cell. *Id.* at 5. Grievances filed on November 15 and November 19 also do not raise any complaints about the condition of his cell.

At no time does he indicate that he suffered any injuries as the result of being housed in the intake unit cell. His first request for a sick call appears in his November 15 grievance, but he complains of a recurrence of back, hip and knee pain from injuries he sustained in a car accident and attributes his present pain to sleeping on a metal bed while in the restrictive housing unit. No mention of a rash, trouble eating, inability to use the

toilet or practice his religion, or any emotional difficulties.

A November 22 communication form requests that he be taken to Muslim services. A second communication filed the same day asks to receive his Commissary orders. A third asks for his property that had been transferred from "SCI Hill Camp." On November 26, he asks for a Koran, prayer rug and Kufi. These are his only communications concerning his ability to practice his religion, they make no mention of the conditions of the intake unit and were filed weeks after he had been moved from that cell.

Although the record evidence is inconsistent with Garrett's current claims, particularly as described in his affidavit submitted in defense of the motion, for purposes of summary judgment, I must and shall accept his version of events. Even still, viewing the totality of the allegations, I find they are insufficient to establish cruel and unusual punishment.

Fully crediting Garrett's description of the condition of his cell, there is not sufficient evidence in the record from which a jury could conclude that the condition of the cell reached a constitutional violation for the following reasons. A survey of other cases in this circuit reveals that such claims were denied when cell conditions were much more severe and where the prisoner was subjected to those conditions for a greater period of time. *See Burkholder v. Newton*, 116 F. App'x 358, 363 (3d Cir. 2004) (confinement in a cell for up to thirty days with a toilet that "often" backs up is insufficient to state an

Eighth Amendment claim); *Ridgeway v. Guyton*, 2015 U.S. Dist. LEXIS 24754 (W.D. Pa., March 5, 2015) (broken toilet overflowing with fecal matter, urine and a black substance not repaired for one month despite continuous complaints).

First, although the conditions described were not pleasant, Garrett testified that he and his cell mate were able to clean the cell with shirts and hand soap and that they were willing to give Vollmer two or three days to get the requested cleaning supplies. This testimony is supported by the fact that he never filed a grievance complaining about the condition of his cell – only one in response to Vollmer's issuance of a misconduct citation for threatening an officer.   In fact, Garrett was moved from the cell before his "grace period" had expired.  It is wholly inconsistent to claim a cell was so uninhabitable that the condition constituted cruel and unusual punishment but still be willing to wait several days for cleaning supplies.  One suffering to the extent claimed by Garrett would not be so gracious.

Next, given the conditions of the cell, Garrett does not meet the duration requirement.  When evaluating whether a prisoner has been deprived of his rights, I may consider the length of time the alleged deprivation lasted.  Courts have rejected claims of greater severity and longer duration.  *See Dumas v. Pennsylvania Dep't of Corr.,* 2001 U.S. Dist. LEXIS (W.D. Pa. Apr. 30, 2007) (no constitutional violation where plaintiff alleges he was in filthy conditions for only three weeks).  Again, by his own testimony, the conditions were such that he was willing to wait two to three days for cleaning

supplies and he was out of the cell before that time had expired.

Finally, there is no evidence that Garrett suffered any significant physical injury as the result of his confinement in this cell.  Although Garrett contends that as the result of his time in this cell he developed anxiety and insomnia, felt degraded, humiliated, discouraged, depressed, and was unable to pray; the only physical injury alleged as the result of being in this cell was a rash that "spread like poison ivy."  *Plt's. Exh. D,* at 27, 39-40.  There is nothing in the record to link these complaints to his time in the intake unit.  Certainly any prisoner might have the same complaints simply because he is imprisoned.  The only medical treatment received was for his skin rash.  The nurse who treated him diagnosed his condition as dry skin common to African Americans and she provided him with hydrocortisone cream that would "hold him over" until he could purchase a cream at the commissary.  *Def.'s Exh. N,* at 33-36.  There is no claim that this treatment was unsuccessful.  This is not the type of "physical injury" that would support a claim of cruel and unusual punishment.

Having concluded that Garrett has not met the objective requirements to establish extreme deprivation for an Eighth Amendment claim, it is not necessary to determine if he has provided evidence of deliberate indifference on the part of the prison officials. Without evidence to show Garrett "faced a substantial risk of serious harm," neither Vollmer nor Rescorla could be found to have "disregard[ed] that risk by failing to take reasonable measures to abate it."  *Farmer,* 511 U.S. at 847.

There is also nothing in the record to show Garrett had complained to any prison official about the conditions of his cell other than Vollmer. Garrett has failed to elicit evidence from which a fact-finder could conclude that Sergeant Rescorla was deliberately indifferent to a risk of harm to Garrett. Rescorla's only information concerning the conditions of Garrett's cell was a telephone call from Vollmer. Garrett testified at his deposition that he heard Vollner make the call to Rescorla. When asked what Vollmer said, Garrett testified that Vollner explained the condition of the cell and "[h]e just asked for cleaning supplies." *See Plt's Exh. I*, Garrett Dep. at 29. He does not say what he heard Vollmer say those conditions were; Vollmer describes the cell as clean and decent, and Rescorla denies any knowledge of the conditions of Garrett's cell. Further, none of the communications or grievances filed by Garrett concerned the condition of his cell until after he was removed from the cell and no longer exposed to any alleged harm. Thus, even if Garrett could establish that the conditions of his cell reached a constitutional level, the evidence is not sufficient to show Rescorla had adequate knowledge from which to form an "actual, subjective appreciation of a substantial risk." *Farmer*, 511 U.S. at 837-38.

B.  Retaliation claims

Second, Garrett raises retaliation claims against Sergeant Rescorla and Warden Wagner based on the misconduct he received in November 2010. He asserts retaliation claims against Lieutenant Castro and Warden Wagner for the March 2011 misconduct.

12

Each misconduct resulted in his being sent to restrictive housing.

A prisoner alleging retaliation must demonstrate "(1) constitutionally protected conduct, (2) an adverse action by prison officials 'sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights,' and (3) 'a causal link between the exercise of his constitutional rights and the adverse action taken against him.'" *Mitchell v. Horn*, 318 F.3d 523, 530 (2d Cir. 2003) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)). The filing of grievances can be constitutionally protected. *Id.*

Once a prisoner has made out a *prima facie* case of retaliation, the burden shifts to the prison officials to prove by a preponderance of the evidence that they "would have made the same decision absent the protected conduct for reasons reasonably related to legitimate penological interests." *Carter v. McGrady*, 292 F.3d 152, 154 (3d Cir. 2002) (citing *Rauser*, 241 F.3d at 334). Further, it is well-established "that decisions of prison administrators are entitled to great deference." *Id.* In such a case, "[t]he relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. *Bullock v. Buck,* 2015 U.S. App. Lexis 7260, *8 (quoting *Superintendent v. Hill*, 472 U.S. 445, 455-56 (1985)). In other words, "if the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline was retaliatory must fail." *See Henderson v. Baird,* 29 F.3d 464 (8th Cir. 1994).

Here, Garrett's first misconduct was not for any complaints he made and he had

not yet filed any grievances.  Officer Vollmer filed the misconduct because Garrett had threatened him and the punishment was imposed after a hearing by an impartial hearing officer.  Rescorla's role in the proceedings was limited approving the filing of the misconduct and there is no indication that he had any contact with Garrett at that time. He simply reviewed the misconduct filed by Vollmer, agreed that the officer had been threatened, and referred the matter for a disciplinary hearing.  Following the hearing, Garrett appealed and Wagner affirmed the decision of the hearing officer but reduced the time in restrictive housing.  There is nothing in the record that supports a claim that Rescorla or Wagner were retaliating against Garrett for complaining about the condition of his cell because he hadn't complained to either of them about it until after the misconduct had been filed.  Moreover, it was the hearing officer, who is not a defendant in this lawsuit, who found the misconduct was warranted after hearing testimony from both Garrett and Vollmer.  Rescorla simply approved the initiation of the misconduct by Vollmer based on his report of the incident.  Wagner approved the decision of the hearing officer but reduced Garrett's time in restrictive housing.

Because there is evidence to support the finding that Garrett had threatened Vollmer, and that the disciplinary action was imposed for a violation of the prison's rules, the decision of the prison administrators is entitled to deference.  Thus, this claim of retaliation must fail.

Garrett's claims against Castro and Wagner for the March 2011 misconduct fail for

the same reasons.  While Garrett argues that some may have been invited by Castro or were not repetitive, it is clear from the record that Garrett filed numerous grievances and communications.  It is also clear that he was repeatedly warned to stop filing multiple communications on the same complaints that had already been decided and it was only after he continued to ignore these warnings that he was disciplined.  Garrett argument that Castro used his discretion not to punish Garrett sooner does not establish animus, rather it shows patience.  Clearly, that patience was tested and ultimately Garrett had to answer for his continued refusal to comply with prison rules.

Again, because there is sufficient evidence that the disciplinary action was imposed for a violation of the rules, the decision of the prison authorities is entitled to deference and this claim must also fail.

### IV.  Conclusion

For the reasons set forth above, I find Garrett has failed to offer evidence from which a fact-finder could conclude that his constitutional rights were violated.  I shall grant the motion for summary judgment filed by defendants Wagner, Rescorla, Castro and Vollmer, and enter judgment in their favor on all claims raised in the complaint.

An appropriate order follows.